**Ali AL–TIMIMI, Petitioner,**

v.

**Andrew JACKSON, Respondent.**

**Civil No. 05–10266.**

United States District Court,
E.D. Michigan,
Southern Division.

Feb. 17, 2009.

Larry A. Smith, Southfield, MI, for Petitioner.

Laura A. Cook, Michigan Department of Attorney General, Lansing, MI, for Respondent.

***OPINION AND ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION, OVERRULING PETITIONER'S OBJECTIONS IN PART, AND DENYING PETITION FOR WRIT OF HABEAS CORPUS***

DAVID M. LAWSON, District Judge.

Petitioner Ali Al–Timimi currently is confined in a Michigan prison serving a fifteen-to-twenty-five-year sentence for second-degree murder. Through counsel, he filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, alleging that he is unlawfully confined because his rights under the Confrontation Clause were violated during his jury trial in the Wayne County, Michigan circuit court. This matter was referred to Magistrate Judge Charles E. Binder, who issued a report on July 5, 2006 recommending that the petition be denied. The petitioner timely filed his objections to the Report and Recommendation, and this matter is now before the Court for *de novo* review.

The focus of the habeas petition is on the manner in which the state court dealt with the unusual circumstances surrounding the unavailability at trial of an important State witness. The witness, Zamen Al–Kasid ("Zamen"), was the petitioner's teenage sister-in-law and the apparent romantic interest of the murder victim, Waheed Al–Alyawi ("Waheed"). Waheed was killed when the motorcycle he was riding was struck by an automobile driven by the petitioner. The State's theory was that the petitioner intentionally caused this collision because the petitioner's family was upset at the relationship between Zamen and Waheed. Zamen provided crucial testimony at the preliminary examination establishing this motive, but she could not be located for trial. The major complication arose when it was discovered that the magistrate's recording equipment malfunctioned, the court reporter had died, and only a few pages of Zamen's prior testimony were preserved. The state trial judge permitted the prosecutor to call witnesses present during Zamen's testimony to repeat what she said at the preliminary examination. Although the petitioner had the opportunity to cross-examine Zamen at the preliminary examination, he contends that the trial witnesses' account of Zamen's testimony did not do justice to the full range of questioning during the prior testimony, and his right to confront Zamen was violated.

The magistrate judge concluded in his report that the petitioner's claim lacked merit. He applied the Supreme Court's watershed Confrontation Clause decision of *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), which was handed down just a few weeks before the state court of appeals issued its opinion in the petitioner's direct appeal, and concluded that there was not much of a contest that Zamen was unavailable at trial, she gave prior statements under oath that properly are characterized as testimonial, and the witness was subject to cross-examination. So he found that the peti-

tioner's real challenge went to the manner in which the testimony was presented to the jury, which did not contravene any clearly establish Supreme Court precedent. Therefore, the magistrate judge suggested, the petitioner was not entitled to a writ of habeas corpus.

The petitioner's objections challenge several factual determinations by the magistrate judge, which the petitioner believes are erroneous and lead to the incorrect conclusion about the fairness of the presentation of the secondary evidence of Zamen's prior testimony. He also disagrees with the magistrate judge's ultimate conclusion that the petitioner was able to confront the witness adequately within the meaning of the Sixth Amendment. After reviewing record, the magistrate judge's report, and the parties' submissions, the Court concludes that although the magistrate judge made some mistakes in his factual account, his ultimate conclusion is compelled by the rigid standard applied to habeas cases in the wake of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104–132, 110 Stat. 1214 (Apr. 24, 1996). The state courts' decision to permit secondary evidence of a State witness's prior testimony—where the petitioner had the opportunity to cross-examine the witness fully during the prior proceeding—was not "contrary to," nor did it "involve[ ] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Therefore, the Court will deny the petition.

## I.

Because the petitioner takes issue with the facts as summarized by the magistrate judge, the Court will review the evidence in some detail. The traffic collision causing Waheed Al–Alyawi's death occurred on October 3, 2001, in Dearborn, Michigan. Waheed was riding a motorcycle when he was struck and killed by an automobile driven by the petitioner. The petitioner fled the scene, but his license-plate number was recorded by two eyewitnesses. When police located and questioned the petitioner, he initially denied having any knowledge of the accident. Eventually, he admitted that he was in an accident but claimed that he did not know Waheed, the victim. The police later learned of the romantic liaison between twenty-six-year-old Waheed and Zamen, the petitioner's sixteen-year-old sister-in-law, which ran counter to the family's wishes. The petitioner was charged with first-degree murder, and Zamen was taken into protective custody before the petitioner's preliminary examination, which was held on October 26, 2001 before the Honorable Virginia Sobotka of the Nineteenth District Court for the City of Dearborn. Zamen escaped but was found prior to the hearing, where she testified under oath as a witness for the prosecution. The petitioner was bound over to circuit court on a charge of first-degree murder.

Zamen continued to be held in protective custody until she again escaped in December 2001. The police department became aware of the disappearance in March or April 2002 and began to search for her. They placed flyers along Seven Mile Road, and interviewed her family and friends, but were unable to find her. When the petitioner's trial commenced on October 7, 2002, Zamen could not be located. The trial court found that the prosecution had undertaken diligent efforts to locate her and declared her an unavailable witness.

In the meantime, it was discovered after the preliminary examination that the court reporter's equipment had malfunctioned during Zamen's testimony. Only five pages could be transcribed. In addition, the court reporter died and a transcript of

the remainder of the hearing could not be produced. The transcript remnant from Zamen's testimony reads:

Q: [state prosecutor]: Could you please tell us your name?

A: Zamen Al–Kasid.

Q: Do you know someone by the name of Ali Al–Timimi?

A: Yes, I do.

Q: Is he present in the courtroom today?

A: Yes, he is.

Q: Could you please tell us where he's seated and what he's wearing?

A: He's sitting—you want me to point him out?

[Q]: Yes.

A: right over there wearing a blue shirt. I believe that has red stripes on it.

[Prosecutor]: Let the record reflect that the witness has pointed to the defendant, Ali Al–Timimi and has described what he's wearing.

Q: . . . Could you tell us how old you are, please?

A: Sixteen years old.

Q: Back in the month of October, even September of the year 2001, did you have a boyfriend?

A: October what, 2001 ?

Q: Yes; of this year.

A: Yes, I did.

Q: Would you tell us your boyfriend's name, please?

A: Waheed Alalyawi.

Q: Back in September of the year 2001 can you tell us where you were living?

A: In September?

Q: Yes.

A: At home.

Q: And where was your home?

A: On Steadman near Ford Road.

Q: While you were living at home on Steadman, were you living with your parents?

A: Yes, I was.

Q: Were you also living on Steadman with anybody else?

A: Yeah.

Q: Who else was living at your house on Steadman besides you and your parents?

A: Ali Al–Timimi and my sister.

Q: You said the defendant, Ali Al–Timimi was living with you as well as your sister?

A: Yes.

Q: Is the defendant, Ali Al–Timimi, somehow related to you?

A: He is my brother-in-law.

Q: He's married to your sister?

A: Yes.

Q: Which sister is that?

A: Nakla (phonetic).

Q: You said your sister and the defendant were living with you in the house on Steadman; is that correct?

A: Yes, because our house on Emmenon was burned and they used to live in the upstrairs [sic] house, because it was a two-story house.

Q: Okay. How long have they been living at your house with you and your parents?

A: I can't remember.

Q: Would it be more than a few months?

A: Yes.

Q: Would it be more than a year?

A: Probably.

Q: Okay. You said that you—you said that your boyfriend's name was Waheed. What was his last name?

A: Alalyawi

Q: His name was Waheed Alalyawi?

A: Right.

Q: Okay. Did there come a point in time when his family and your family

became involved in at least some kind of an arrangement between the two of you?

A: Kind of.

Q: When you say kind of, can you tell us about that?

A: Well, when he came he sent his mother and his mother's friend to engage me.

Q: When you say engage me, what does that mean?

A: To ask for my hand.

Q: You mean to ask for your hand in marriage?

A: Yes.

Q: Okay. When his mother came to your family who did she speak to?

A: My family.

Q: Yes, but who specifically in your family did she speak to?

A: My mother.

Q: Okay. Did that result in an arrangement, a marriage arrangement between the mothers?

A: Yes.

Q: Okay. During the time that this arrangement was going on, was that also during the time that the defendant was living with you and your family on Steadman?

A: Yes.

Q: Okay. And did something happen to this marriage agreement that caused it to fall apart?

A: Yeah.

Q: Okay. And what was that?

A: They said no because he was bad; he used to drink and go out with girls. That's what they told me.

Q: Okay. Who ultimately told you they weren't going to let the arranged marriage happen?

A: My mother and father.

Q: Okay. Your mother and father told that you [sic] this arranged marriage was not going to happen. Were you ever told not to see Waheed after that?

A: Yes, I was.

Q: Okay. And did you follow that?

A: No, I didn't.

Q: Okay. And what did you do after having been told not to have any contact with Waheed?

A: I kept in contact with him.

Q: Did there come a time when the defendant in this case, Ali Al–Timimi, prior to October 3, 2001 wanted to have a conversation with you regarding your relationship with Waheed?

A: Yes.

Q: Okay. What can you tell us about that?

A: He had come to my school that day.

Q: Okay. Which date did he come to your school?

A: October 3rd.

Q: What school is that?

A: Fordson High School.

Q: And what happened when the defendant, Ali Al–Timimi, came to Fordson High School on October 3, 2001?

A: [nothing further written]

State Court Transcript of Proceedings held on 10/26/01, at 81–86.

After that testimony was read to the jury, the trial court permitted the parties to call witnesses who were in the courtroom during the preliminary examination to tell the trial jury what they remembered of Zamen's testimony. The first witness called for this purpose was Judge Sobotka herself, although she was not identified as a judge, but merely as a person who was in the courtroom during the preliminary examination. Judge Sobotka had taken two pages of notes during Zamen's testimony, two-thirds of which were from the direct examination and one-third from the cross-examination. She testified that the testimony was not very long, and that she took notes "[v]ery brief-

ly" on the cross-examination. Tr., 10/9/02 at 63–64, 66.

Judge Sobotka referred to her notes as she testified. She told the jury that Zamen had testified that Zamen's sister's husband (the petitioner) had talked to her three times about her relationship with Waheed. During the second of these conversations, which occurred on the way to school, the petitioner had told her that "the marriage would be off and that she would be forbidden to see him" because "[h]e was bad and she would ruin the family." *Id.* at 59. The third conversation occurred on the day of the accident, and Judge Sobotka described Zamen's testimony as follows:

A: She [Zamen] was using the cell phone talking to Waheed when her father discovered her. And he started beating her. She started screaming. The family came into her room.

Q: When you say that she said he started beating her, who was she describing as he?

A: Her father.

Q: Her father was beating her.

A: And at that time when she started screaming then the other members of the family came into her room.

Q: Okay. Let me back up another second. Did [Zamen] testify about where she had gotten this cell phone that she was caught with?

A: From Waheed.

Q: Did she describe the purpose for why Waheed had given this cell phone?

A: So that he could keep in touch with her.

Q: All right. After the family or after her father—she testified that her father found her talking on this cell phone and beat her, what did she describe happened next?

A: Her screaming brought the other members of the family into the room.

Q: What did she then describe happened?

A: After the other family members left, her brother-in-law [the petitioner] remained.

. . .

Q: Did she say what it was that Mr. Ali Al–Timimi said to her after he remained to talk to her?

A: It started out with that, you cannot marry him. He is bad. You will ruin the family. Then he said that he would take care of him. [H]e would kill him. [A]nd I Haider would kill her.

Q: Haider?

A: Her brother, Haider.

Q: All right. So specifically did she testify that the Defendant said that he would kill Waheed?

A: Yes.

Q: Did she say—Did she testify as to when he said he would do that?

A: He said today he would take care of him. He would kill him and Haider would take care of you and kill you.

*Id.* at 60–62.

Judge Sobotka testified that she wrote down twice exactly what Zamen testified was said by her brother: " 'You'll see what I'll do to deceased. He won't be alive. Haider will kill you. . . . I will kill decease[d]. . . . Today you will see what I will do. I will kill. And your brother will kill you.' " *Id.* at 63.

The second witness to recount Zamen's preliminary examination testimony was Anne Kanitra, a detective with the Dearborn Police Department. She told the jury that Zamen had testified that Waheed was her boyfriend and that she was engaged to marry him, although her family disapproved. *Id.* at 73. Kanitra remembered Zamen testifying that the petitioner

had gone to her school and pulled her out of class, pulled her out of school and told her or asked her are you seeing Waheed, and she denied it to him, saying, no I'm not seeing him, although she was seeing him.

*Id.* at 74.

Kanitra said that Zamen recounted the following events that occurred during her final contact with her brother-in-law on the day of Waheed's death:

Q: And what did she say happened after Mr. Al–Timimi got her out of school that day?

A: When they had went [sic] home to the house, she was on her cell phone talking to Waheed, and I believe her father walked in and caught her on the phone talking to him and became upset.

Q: Did she say where it was that she got this cell phone?

A: I believe it was from Waheed. It was not from her family. Waheed bought it for her.

Q: And after her father discovered her on her cell phone, what did she say happened?

A: He became very upset and I think struck her.

Q: Did she say what happened after that?

A: She was kept in a room, in her room, made to stay in her room. And then Ali [Al–Timimi] came in.

. . .

He came in and told her that you better not see him, and if you—I'm going to kill Waheed and Haider, Haider is her brother. Is Zamen's brother. Will kill you.

Q: Do you specifically remember Zamen Al–Kasid testifying under oath that Mr. Ali Al–Timimi told her that he was going to kill Waheed?

A: Yes.

*Id.* at 75–76.

Kanitra admitted on cross-examination that she did not take notes during the preliminary examination, and she was recalling Zamen's testimony strictly from memory. She also stated that she did not remember which facts were brought out during the direct examination as opposed to those elicited on cross-examination. She did not recall Zamen testifying that Waheed has told her that he was going to kill himself.

The final witness who related Zamen's preliminary examination testimony for the jury was Paul Keiper, also a detective with the Dearborn Police Department. He testified without notes, from memory, and said:

A: She testified that Ali Al–Timimi had gone to Fordson High School where she's a student. He got permission to remove her from the school. He took her home. He had discussed with her about the fact that she was not to see Waheed, because she was disgracing the family.

Q: Did she indicate what happened after Mr. Al–Timimi took her home?

A: Eventually she was in her room. And she had a cell phone that Waheed had given to her so that they could keep in touch with each other. She was talking with Waheed on the phone when her father came into the room. He caught her on the phone, took the phone away from her. He slapped her and that was it at that point in time.

. . .

Q: Did she indicate what happened after her father slapped her after finding the cell phone?

A: A short time later, Ali Al–Timimi came into the room. He was again upset with her over not listening to what the family had said and he told her that

he was going to kill Waheed and that her brother Haider was going to kill her. *Id.* at 91–93. The defense elected not to call any witnesses who were in the courtroom during the preliminary examination to testify as to their recollection of Zamen's testimony, and the defense claimed that no other person in the courtroom had a full recollection of the cross-examination testimony.

The prosecution also called other witnesses who described the relationships, as did the defense. One defense witness, Rafah Al–Kasid, testified that she brought Zamen clothing before the preliminary examination, and asked her about the incident. She testified that she asked Zamen

> you going to be testifying today, you know that? she said, yes. And I said, are you going to say something about Ali, like he killed Waheed or anything else? And she said, Ali not killed Waheed. Waheed killed himself. And I said, what do you mean by that? And she said, Waheed told me that if I won't marry you I will kill myself.... and when I say what are you going to testify about? She said, what they want me to say.

Tr., 10/9/2002, at 116. She testified that Zamen told her that the officers were preventing her from contacting the family. Rafah testified that after the preliminary examination, Zamen said that she only testified that way because she was threatened with being put in a mental hospital or jail for fifteen years by a police officer.

Emad Al–Kasid, Zamen's brother, also testified for the defense. He testified that the petitioner was not involved with disciplining Zamen, and it would be against the family's religious beliefs to have the petitioner alone with Zamen at any point. Nahla Al–Kasid, the petitioner's wife, testified that she did not hear any fighting between Zamen and her father, and the petitioner did not enter Zamen's room because it would have been against their religious beliefs. Ahmed Alkhalidi, a longtime friend of the petitioner, testified that the petitioner was at his house on October 3 from 2:00 or 2:15 in the afternoon until 5:30 or 6:00.

Each side called an accident reconstruction expert witness. Gordon McIntosh, a corporal with the accident reconstruction division of the Dearborn Police Department, testifying for the prosecution, said that there were oil droplets on the road that, he believed, were from the motorcycle because they followed the gouge marks in the pavement. The oil droplets were in a straight line, which was "inconsistent" with a motorcycle veering sharply. Tr., 10/8/2002, at 148. McIntosh also testified that there were no skid marks, as would be expected if there was hard breaking.

Sammie Hall, a professional Traffic Accident Reconstructionist, testified for the defense that, based on the damage to both vehicles,

> the motorcyclist was eventually impacted from the rear. But what happened, because the difference in speed was at or about ten miles per hour, that motorcycle made contact with the right side of the vehicle, continued in front of the car, and it is my assumption, it is my opinion, that the motorcyclist was out of control and once the vehicle is out of control, it's basically my opinion again, that he was decelerating.

Tr., 10/10/2002, at 24. He also challenged Mr. McIntosh's conclusion regarding the oil spots, noting that the vehicle was probably traveling 35 miles per hour, or 51 feet per second, and it would "ha[ve] to be a rather distinctive or a steady stream of oil coming out." *Id.* at 40. He also noted that there was an oil-change establishment nearby that also could have contributed to the oil spots on the road.

At the conclusion of the five-day trial, the jury found the petitioner guilty of sec-

ond-degree murder, and he was subsequently sentenced to fifteen to twenty-five years in prison. On direct appeal, the petitioner raised his Sixth Amendment issue and argued that the attempt to reconstruct Zamen's preliminary examination testimony was "grossly incomplete" and "failed to include all of the substance of that witness testimony, including that given on cross-examination." The court of appeals, applying *Crawford v. Washington*, rejected this argument. The court noted:

> [D]efendant fails to demonstrate that the witnesses at issue lacked knowledge about Al–Kasid's testimony on cross-examination at the preliminary examination. Our review of the witnesses' testimony reveals that these witnesses' recollections were not limited to only the direct examination portion of Al–Kasid's testimony. Moreover, defendant had the opportunity to interview and present any other witnesses that may have been present during Al–Kasid's cross-examination.

*People v. Al–Timimi*, 2004 WL 1254271, at *3 (Mich.Ct.App. Jun. 8, 2004) (unpublished). Over the dissent of two justices, the Supreme Court of Michigan denied leave to appeal on March 31, 2005. *People v. Al–Timimi*, 472 Mich. 882, 693 N.W.2d 822 (Mar. 31, 2005) (table).

Thereafter, the petitioner filed a timely petition for a writ of habeas corpus in this Court, alleging a violation of his Sixth Amendment right to confront and cross-examine a witness because Zamen was not produced for trial and the secondary evidence of her prior testimony was inadequate to satisfy the Confrontation Clause. The respondent filed an answer in opposition, and Judge Binder issued a report recommending that the petition be denied.

## II.

The petitioner objects to several of Judge Binder's factual findings, including a

statement in the report that Judge Sobotka had taken six pages of notes during Zamen's testimony, an assertion that "the defense elected not to call any witnesses who were in the courtroom during the preliminary examination to testify as to their recollection of Zamen's testimony," R & R at 852, and Judge Binder's deference to the factual determinations of the state court. The petitioner also objects to Judge Binder's substantive characterization as a "state law question," R & R at 858, the issue of the mode in which an absent witness's prior statements are presented. Finally, he takes issue with Judge Binder's assertion that the petitioner cited only *dicta* in *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970) for the proposition that the manner of presentation of an out-of-court statement can run afoul of the Confrontation Clause. The petitioner believes that *Crawford*, which he cited frequently, also stands for this proposition, and he cited *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), and *Mattox v. United States*, 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409 (1895), for this same proposition.

■ Objections to a report and recommendation are reviewed *de novo*. 28 U.S.C. § 636(b)(1). The Sixth Circuit has stated that "[o]verly general objections do not satisfy the objection requirement." *Spencer v. Bouchard*, 449 F.3d 721, 725 (6th Cir.2006). "The objections must be clear enough to enable the district court to discern those issues that are dispositive and contentious." *Miller v. Currie*, 50 F.3d 373, 380 (6th Cir.1995). " '[O]bjections disput[ing] the correctness of the magistrate's recommendation but fail[ing] to specify the findings ... believed [to be] in error' are too general." *Spencer*, 449 F.3d at 725 (quoting *Miller*, 50 F.3d at 380).

The petitioner is correct on one of his factual challenges, but this error does not necessarily change the legal analysis. The petitioner is correct that Judge Sobotka took only two pages of notes on the testimony of the critical witness, not six pages as stated by the magistrate judge. However, the petitioner has not provided evidence to support his other factual challenges. For example, the petitioner points to *arguments* made by his counsel in the trial court for the proposition that "not a single person known to have been present claimed any knowledge of the substance of the cross-examination testimony." Petr.'s Obj. at 4 (citing Tr. 10/3/02, 14–15, 19–12). But the *testimony* he references is inconclusive on the point. For instance, he points to Judge Sobotka's testimony that she took some notes on the petitioner's cross-examination, but did not record certain dates or times discussed during the examination. However, the record indicates that about one-third of Judge Sobotka's notes related to the defense cross-examination. Nonetheless, no one ever asked Judge Sobotka to separate the information she received on direct examination from that revealed on cross-examination. Judge Sobotka's trial testimony does not establish that the defense cross-examination could not have been explored at trial. Detective Kanitra testified that she did not take any notes, and stated that she did not know whether the testimony she remembered was elicited on direct or cross-examination. Dearborn detective Paul Keiper was never even asked about the information he remembered from the direct as opposed to the cross-examination. And trial counsel, who also was the cross-examiner at the preliminary examination, never suggested that the record was incomplete or made an offer of proof of cross-examination evidence that was omitted from the witness accounts. This showing does not establish that there were no witnesses that could describe Zamen's testimony on cross-examination.

Turning to the substantive objections, the petitioner disputes the magistrate judge's characterization of the passage from *California v. Green* relied upon as *dicta,* and he disagrees with the ultimate determination that using secondary evidence of an absent witness's prior testimony satisfies the Confrontation Clause. Although the petitioner's arguments have some persuasive force, they do not carry the day.

The development of the rights preserved by the Confrontation Clause, chronicled to some extent in *Crawford,* 541 U.S. at 54–57, 124 S.Ct. 1354, parallels (but does not duplicate) the evolution of the rule against hearsay. As the source of proof in trials at common law evolved from the private knowledge or results of investigation by jurors themselves to the testimony of witnesses in open court, a premium was placed on procedures intended to ensure the reliability of the evidence presented to disinterested fact finders. The reliability of a witness's testimony depends in large measure on the witness's ability to perceive, remember and relate events, and the witness's sincerity. *See* 2 *McCormick on Evidence,* § 245, p. 93 (5th ed. 1999).

> In order to encourage witnesses to put forth their best efforts and to expose inaccuracies that might be present with respect to any of the foregoing factors, the Anglo–American tradition evolved three conditions under which witnesses ordinarily are required to testify: oath, personal presence at trial, and cross-examination. The rule against hearsay is designed to insure compliance with these ideal conditions, and when one of them is absent, the hearsay objection becomes pertinent.

*Ibid.* (footnote omitted).

In hearsay jurisprudence, these testimonial guarantees historically have not been

viewed as ends in themselves, but rather as means intended to achieve the ultimate goal: reliability of the evidence considered by disinterested fact finders. Thus, where there are functional substitutes for the testimonial guarantees which ensure reliability, rendering them "a work of supererogation," 5 J. Wigmore, *Evidence* § 1420, at 251 (J. Chadbourn rev. 1974), they are comfortably dispatched and exceptions to the rule against hearsay are recognized. *See, e.g. Idaho v. Wright*, 497 U.S. 805, 820, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990) (explaining rationale behind excited utterance, dying declaration, and medical treatment hearsay exceptions).

The Confrontation Clause was intended to import these same protections assuring reliability into American criminal procedure. As the Supreme Court explained over a century ago:

> The primary object of the constitutional provision in question was to prevent depositions or *ex parte* affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness, in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.

*Mattox v. United States*, 156 U.S. 237, 242–243, 15 S.Ct. 337, 39 L.Ed. 409 (1895). The purpose of the Confrontation Clause, then, was to "constitutionalize" the common-law testimonial guarantees by which an accused could test a witness' perception, memory, ability to relate or communicate, and, perhaps most importantly, his sincerity.

> Confrontation: (1) insures that the witness will give his statements under oath—thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the "greatest legal engine ever invented for the discovery of truth" [Wigmore, § 1367]; (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility.

*California v. Green*, 399 U.S. 149, 158, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970) (footnote omitted).

Although the interests embraced by the hearsay rule and the Confrontation Clause are similar, the reach of the two provisions is not conterminous. *Crawford*, 541 U.S. at 51, 124 S.Ct. 1354 (noting that "not all hearsay implicates the Sixth Amendment's core concerns"). "The Confrontation Clause ... bars the admission of some evidence that would be otherwise admissible under an exception to the hearsay rule." *Wright*, 497 U.S. at 814, 110 S.Ct. 3139. Likewise, the Supreme Court has never read the Clause literally to require the exclusion of all hearsay. *Ohio v. Roberts*, 448 U.S. 56, 63, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) (noting that to do so would effectuate "a result long rejected as unintended and too extreme"), *overruled by Crawford*, 541 U.S. 36, 124 S.Ct. 1354.

In *Ohio v. Roberts*, the Supreme Court likewise viewed the procedural protections of the Confrontation Clause as a means to an end, and, although re-emphasizing the judicial preference for face-to-face confrontations, focused on reliability as the touchstone for admissibility of out-of-court statements against an accused. "First, in conformance with the Framers' preference for face-to-face accusation, the Sixth

Amendment establishes a rule of necessity. [Generally,] the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant." *Id.* at 65, 100 S.Ct. 2531. Second, if a witness is shown to be unavailable, "his statement is admissible only if it bears adequate 'indicia of reliability.'" *Id.* at 66, 100 S.Ct. 2531.

The Supreme Court rejected that approach in *Crawford,* declaring that the prior line of cases was flawed because the standard they applied was unpredictable. It criticized conditioning the fulfillment of confrontation rights on the judicial determination of reliability on the grounds that "[r]eliability is an amorphous, if not entirely subjective, concept. There are countless factors bearing on whether a statement is reliable." *Crawford,* 541 U.S. at 63, 124 S.Ct. 1354. However, the Court's decision to opt for a clear-cut procedural ultimatum over the *Roberts* balancing test rested on its desire to not "admit core testimonial statements that the Confrontation Clause plainly meant to exclude," and not the prior test's "unpredictability." *See ibid.*

The Court was not satisfied with *Roberts*'s reliance on determinations of reliability in the absence of a concrete procedural safeguard. The Court repeatedly emphasized that the Constitution favors cross-examination as the vehicle for testing a witness's credibility:

> [T]he Clause's ultimate goal is to ensure reliability of evidence, but it is procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. The Clause thus reflects a judgment, not only about the desirability of reliable evidence (a point on which there could be little dissent), but about how reliability can best be determined. Cf. 3 Black-

stone, Commentaries, at 373 ("This open examination of witnesses ... is much more conducive to the clearing up of truth"); M. Hale, History and Analysis of the Common Law of England 258 (1713) (adversarial testing "beats and bolts out the Truth much better").

*Id.* at 61–62, 124 S.Ct. 1354. The prior opportunity to cross-examine, therefore, is a necessary condition for admitting out-of-court statements. *Id.* at 55, 124 S.Ct. 1354. The Court described the "evil" against which the Confrontation Clause was meant to protect: "the civil-law mode of criminal procedure, and particularly its use of ex parte examinations as evidence against the accused." *Id.* at 50, 124 S.Ct. 1354.

The *Crawford* Court, however, did not require the opportunity for cross-examination to take place at the time of trial. *See id.* at 53–54, 124 S.Ct. 1354 (holding that the Confrontation Clause only prohibits the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a *prior* opportunity for cross-examination") (emphasis added). And although the Sixth Circuit has expressed some doubt over the admissibility of preliminary hearing testimony of an absent witness under pre-*Crawford* law, *see Vasquez v. Jones,* 496 F.3d 564, 577 (6th Cir.2007) (stating that "we doubt that the opportunity to question a witness at a preliminary examination hearing satisfies the pre-*Crawford* understanding of the Confrontation Clause's guarantee of 'an opportunity for effective cross-examination' ... when the witness does not appear at trial") (quoting *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985) (per curiam)), that point does not appear to be in contention in the present case. The Supreme Court has found no Confrontation Clause violation by the admission of prior testimony of an absent witness when

there was an opportunity for cross-examination at the prior proceeding. *Mattox v. United States,* 156 U.S. 237, 244, 15 S.Ct. 337, 39 L.Ed. 409 (1895). Although the prior testimony in *Mattox* was given at the first trial of the case, the Supreme Court has allowed that preliminary hearing testimony may suffice as well. *See Barber v. Page,* 390 U.S. 719, 725–726, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968) (noting that although the preliminary hearing is ordinarily a less searching exploration into the merits of a case than a trial, "there may be some justification for holding that the opportunity for cross-examination of a witness as a preliminary hearing satisfies the demand of the confrontation clause where the witness is shown to be actually unavailable"); *Pointer v. Texas,* 380 U.S. 400, 407, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965) (finding Confrontation Clause violation by admission of preliminary hearing testimony, but noting that "[t]he case before us would be quite a different one had Phillips' statement been taken at a full-fledged hearing at which petitioner had been represented by counsel who had been given a complete and adequate opportunity to cross-examine").

But the petitioner insists that the Confrontation Clause regulates not only the manner in which prior testimony may be obtained—in a judicial proceeding where the accused has the right and opportunity for cross-examination—but also the manner in which that prior testimony may be reproduced at the trial later on. Although the petitioner cites *Crawford* and *Dutton v. Evans* for this proposition, his main source of Supreme Court law for this point is *California v. Green,* where the Court held that a witness's preliminary hearing testimony was admissible, although the witness also was present at trial. The Court wrote:

> We also think that Porter's preliminary hearing testimony was admissible as far as the Constitution is concerned wholly apart from the question of whether respondent had an effective opportunity for confrontation at the subsequent trial. For Porter's statement at the preliminary hearing had already been given under circumstances closely approximating those that surround the typical trial. Porter was under oath; respondent was represented by counsel—the same counsel in fact who later represented him at the trial; respondent had every opportunity to cross-examine Porter as to his statement; *and the proceedings were conducted before a judicial tribunal, equipped to provide a judicial record of the hearings.* Under these circumstances, Porter's statement would, we think, have been admissible at trial even in Porter's absence if Porter had been actually unavailable, despite good-faith efforts of the State to produce him. That being the case, we do not think a different result should follow where the witness is actually produced.

*California v. Green,* 399 U.S. 149, 165, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970) (emphasis added).

The petitioner points to the emphasized language as setting forth a constitutional minimum standard for the admission of former testimony. The magistrate judge dismissed this language as *dicta,* but it is not readily apparent that such is the case. *Dictum,* or *obiter dictum,* is "[a] judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential (although it may be considered persuasive)." *United States v. Hardin,* 539 F.3d 404, 439–440 (6th Cir. 2008) (Bachelder, J., dissenting) (quoting *Black's Law Dictionary* (8th ed. 2004).) Since the witness in *Green* was present at the trial, the pronouncement regarding the prior testimony's admissibility had the witness been unavailable is not necessary to

the decision. However, it is not clear that the four-part analysis constitutes *dictum*. The Court did not address directly which of its two holdings—that Green's confrontation rights were vindicated because the witness was present at trial, and his rights also were satisfied because of the procedures used at the prior hearing—was primary, and which was secondary. To conclude that the holding that comes first in the opinion is the basis for the decision while the second one is mere *dictum* would be arbitrary.

Nonetheless, the Court does not believe that the Supreme Court intended the four factors set forth in *Green*—oath; prior representation by counsel; opportunity to cross-examine; and proceedings before a judicial tribunal equipped to provide a judicial record—to be the irreducible minimum requirements for prior testimony to pass muster under the Confrontation Clause. It is more likely that the Court cited those factors in support of its finding that procedures were adequate to ensure reliability—a criterion later rejected by *Crawford* as a sufficient condition.

In fact, the historical record does not suggest that a verbatim record is a necessary prerequisite for the admission of prior testimony at all, although certainly there is a preference for it. In *Toledo Traction Co. v. Cameron*, 137 F. 48, 57–62 (6th Cir.1905), the court held that prior testimony of an absent witness was admissible in a civil case. The court reviewed the body of law on the subject, citing *Burton v. Driggs*, 87 U.S. (20 Wall.) 125, 22 L.Ed. 299 (1873), in which the plaintiff offered to prove the contents of a deposition of an absent witness, but which had been lost. The Supreme Court found no error, stating:

> 'In *Harper v. Cook*, 1 Car. & Payne, 139, it was held that the contents of a lost affidavit might be shown by secondary evidence. The necessity of re-taking it was not suggested. In the present case the witness lived in another state, and more than one hundred miles from the place of trial. The process of the court could not reach him. For all jurisdictional purposes, he was as if he were dead.'

*Toledo Traction*, 137 F. at 60–61 (quoting *Burton*, 87 U.S. at 134). The court also cited *Ruch v. Rock Island*, 97 U.S. 693, 24 L.Ed. 1101 (1878), in which the Supreme Court approved the admission of an absent witness's former testimony through the oral evidence of witnesses who heard the deceased witness testify and had taken notes of it. Dean Wigmore writes that the preferred manner of preserving an accused person's statement to an English magistrate was the magistrate's report. 3 Wigmore, *Evidence* § 1326, at 1616 (1904). However, when that report was unavailable, secondary evidence was accepted. *Id.* § 1327, at 1621 ("[I]f the preferred testimony is unavailable, either because it is lost or otherwise inaccessible, or because it never existed, the requirement of its use ceases. The magistrate's report, then, is not required, and any other testimony to what was said may be used, if the magistrate's report is lost or otherwise inaccessible, or if it was irregularly taken so as to be inadmissible, or if it was never taken in writing at all. But the party wishing to use such other testimony must show that the preferred testimony is unavailable."). According to the cases that preceded present-day technology, "[t]he general rule, in [the case of an absent witness], seems always to have been to prove the evidence of the deceased witness by some one who heard it on the former occasion and could testify to the substance of it." *Anderson v. Reid*, 10 App.D.C. 426, 1897 WL 17677, at *3 (D.C.Cir.1897) (citing 1 Greenleaf Evidence, §§ 155, 156; *Ruch v. Rock Island*, 97 U.S. 693, 694, 24 L.Ed. 1101 (1878)).

These cases do not directly impact Confrontation Clause jurisprudence. However, they do demonstrate the acceptance of secondary evidence on occasions where prior testimony is permitted but for some reason was not available in a verbatim record. And they do reflect that acceptance at or near a time when the Sixth Amendment was ratified.

In the petitioner's case, assuming as true the petitioner's claim that no witness could recount the prior cross-examination of Zamen at the preliminary examination, the question whether the petitioner's Confrontation Clause rights were abridged depends on two propositions: 1) the significance and continued viability of the *Green* list of factors, including *Green*'s observation that "the proceedings were conducted before a judicial tribunal, equipped to provide a judicial record of the hearings;" and 2) the extent to which *Crawford* implicitly demands the preservation of prior cross-examination verbatim.

*Crawford* rejected the "indicia of reliability" test in favor of a more predictable requirement that there be cross-examination. The "four-factor" analysis in *Green* could be read as one application of the analysis that the Court used later in *Roberts* but then rejected entirely in *Crawford*. Under this view, the Court's decision in *Crawford* eviscerates any viability of *Green*'s emphasis on "judicial record," and there is no other Supreme Court case that demands that result. Under another view, however, *Crawford* merely set the floor for admissibility and did not intend to permit a court to admit obviously unreliable testimony, such as testimony that did not meet the criteria laid out in *Green* or otherwise would have failed the *Roberts* test. Both of these positions are plausible.

However, in order for the writ to issue, the petitioner must establish that the state court's adjudication of his Sixth Amendment claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Mere error by the state court will not justify issuance of the writ; rather, the state court's application of federal law "must have been objectively unreasonable." *Wiggins v. Smith*, 539 U.S. 510, 520–21, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 409, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (internal quotes omitted)).

■ The Michigan Court of Appeals held that the petitioner's rights under the Confrontation Clause were not violated because he had an opportunity to cross-examine Zamen at the preliminary examination, and, although that court found the secondary witnesses were reliable reporters of the testimony, that court did not read *Crawford* as requiring such a finding. Nor did that court find that *Crawford* or other Supreme Court precedent required that prior testimony be preserved verbatim. As noted above, that is a plausible, if not a desirable, reading of *Crawford*, which, unfortunately for the petitioner, means the resolution by the Michigan Court of Appeals was not unreasonable. *See Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) ("[A] federal habeas court may not issue a writ under the unreasonable application clause simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established Federal law erroneously or incorrectly." (internal quotations omitted)); *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir.2005) ("the 'unreasonable' requirement is a high bar").

This Court must conclude, therefore, that the procedure used in this case to present the out-of-court statements of Za-

men Al–Kasid to the jury did not violate clearly established federal law.

### III.

Although the Court finds that some of the petitioner's procedural objections have merit, their resolution does not change the magistrate judge's ultimate conclusion that the petitioner has not shown that he is presently in custody in violation of the Constitution or the clearly established laws of the United States as determined by the Supreme Court.

Accordingly, it is **ORDERED** that the petitioner's objections to the magistrate judge's report and recommendation [dkt. # 30] are **OVERRULED in part.**

It is further **ORDERED** that the magistrate judge's recommendation [dkt. # 29] is **ADOPTED.**

It is further **ORDERED** that the petition for a writ of habeas corpus is **DENIED.**

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON PETITION FOR WRIT OF HABEAS CORPUS

CHARLES E. BINDER, United States Magistrate Judge.

### I. *RECOMMENDATION*

For the reasons set forth below, **IT IS RECOMMENDED** that the Petition for Writ of Habeas Corpus be **DENIED** and the case be **DISMISSED WITH PREJUDICE.**

### II. *REPORT*

#### A. Introduction

Pending, pursuant to an Order of Reference from United States District Judge David Lawson, is Ali Al–Timimi's Petition for Writ of Habeas Corpus. (Dkt. 1.) The petition, which was filed through counsel on October 6, 2005, argues that Petitioner's rights under the Confrontation Clause of the United States Constitution were violated during his 2002 state court jury trial. Petitioner was convicted of murder in the second degree contrary to Michigan Compiled Laws § 750.317 and sentenced to 15 to 25 years in prison. Petitioner is currently incarcerated at the Mound Correctional Facility in Detroit, Michigan. On November 28, 2005, the petition was referred to the undersigned Magistrate Judge. (Dkt. 5.) A response to the petition was filed on April 14, 2006, and the Rule 5 materials were subsequently filed on May 5, 2006. Accordingly, the case is ready for Report and Recommendation.

#### B. Statement of Pertinent Facts

Petitioner's conviction arose from the death of Waheed Al–Alyawi ("Waheed"), which occurred on October 3, 2001, in Dearborn Michigan. Waheed was riding a motorcycle when he was struck and killed by an automobile driven by Petitioner. (Br. in Supp. of Pet., Dkt. 1 at 1.) Petitioner fled the scene of the accident, but his license-plate number was recorded by two eyewitnesses. (Dkt. 16, Trial Transcript ["TT"] of 10/8/02 at 58 & 67.) When police located and questioned Petitioner, he initially denied having any knowledge of the accident. (*Id.* at 198.) Eventually he admitted that he was in an accident (*id.* at 199–200), but claimed that he did not know the person on the motorcycle whom he had struck and killed. (Dkt. 17, TT of 10/9/02 at 79.) The police later learned, however, that Waheed, the twenty-six-year-old victim, had been romantically involved with Petitioner's sixteen-year-old sister-in-law, Zamen Al–Kasid ("Zamen"), against the family's wishes.

Zamen was taken into protective custody prior to Petitioner's preliminary examination, which was held on October 26, 2001, before the Honorable Virginia Sobotka of the 19th District Court for the City

of Dearborn. Zamen testified as a witness for the prosecution and Petitioner was bound over to circuit court on a charge of first degree murder. Following the preliminary examination, it was discovered that the court reporter's equipment had malfunctioned during Zamen's testimony; only five pages could be transcribed. In addition, the court reporter died and a transcript of the remainder of the hearing could not be produced.

When Petitioner's trial commenced on October 7, 2002, Zamen could not be located. The trial court found that the prosecution had undertaken diligent efforts to locate her and declared her an unavailable witness. (Dkt. 15, TT of 10/7/02 at 86.) The court also held that, after the five surviving transcript pages of Zamen's preliminary exam testimony were read to the jury, the parties would be allowed to call witnesses who were in the courtroom during the preliminary examination to tell the trial jury what they remembered of Zamen's testimony. (*Id.* at 21.)

The first witness called for this purpose was Judge Sobotka herself, although she was not identified as a judge, but merely as a person who was in the courtroom during the preliminary exam. Judge Sobotka had taken six pages of notes during Zamen's testimony, two-thirds of which were from the direct examination and one-third from the cross-exam. (Dkt. 17, TT of 10/9/02 at 66.) Judge Sobotka referred to her notes as she testified. She told the jury that Zamen had testified that Petitioner, Zamen's sister's husband, had talked to her three times about her relationship with Waheed. During the second of these conversations, which occurred on the way to school, Petitioner had told her that "the marriage would be off and that she would be forbidden to see him" because "[h]e was bad and she would ruin the family." (*Id.* at 59.) The third conversation occurred on the day of the accident,

and Judge Sobotka described Zamen's testimony as follows:

A She [Zamen] was using the cell phone talking to Waheed when her father discovered her. And he started beating her. She started screaming. The family came into her room.

Q When you say that she said he started beating her, who was she describing as he?

A Her father.

Q Her father was beating her.

A And at that time when she started screaming then the other members of the family came into her room.

Q Okay. Let me back up another second. Did [Zamen] testify about where she had gotten this cell phone that she was caught with?

A From Waheed.

Q Did she describe the purpose for why Waheed had given this cell phone? A So that he could keep in touch with her.

Q All right. After the family or after her father—she. testified that her father found her talking on this cell phone and beat her, what did she describe happened next?

A Her screaming brought the other members of the family into the room.

Q What did she then describe happened?

A After the other family members left, her brother-in-law [Petitioner Al–Timimi] remained.

. . . .

Q Did she say what it was that Mr. Ali Al–Timimi said to her after he remained to talk to her?

A It started out with that, you cannot marry him. He is bad. You will ruin the family. Then he said that he would take care of him. [H]e would kill him. [A]nd I Haider would kill her.

Q Haider?

A Her brother, Haider.

Q All right. So specifically did she testify that the Defendant said that he would kill Waheed?

A Yes.

Q Did she say—Did she testify as to when he said he would do that?

A He said today he would take care of him. He would kill him and Haider would take care of you and kill you.

Q Do you have those specific, or that specific from the testimony—

A I wrote down the quote.

Q All right.

(*Id.* at 60–62.)

The second witness to recount Zamen's preliminary examination testimony was Detective Sergeant Anne Kinitra of the Dearborn Police Department. She told the jury that Zamen had testified that Waheed was her boyfriend and that she was engaged to marry him, although her family disapproved. (*Id.* at 73.) Further, with regard to her brother-in-law, Petitioner Ali Al–Timimi, Detective Kinitra remembered Zamen testifying that:

He had gone to her school and pulled her out of class, pulled her out of school and told her or asked her are you seeing Waheed, and she denied it to him, saying, no I'm not seeing him, although she was seeing him.

(*Id.* at 74.) As to her final contact with her brother-in-law on the day of Waheed's death:

Q Did she testify as to whether Mr. Al–Timimi came to her school and got her out of school that day?

A Yes.

Q And what did she say happened after Mr. Al–Timimi got her out of school that day?

A When they had went home to the house, she was on her cell phone talking to Waheed, and I believe her father walked in and caught her on the phone talking to him and became upset.

. . . .

He became very upset and I think struck her.

Q Did she say what happened after that?

A She was kept in a room, in her room, made to stay in her room. And then Ali came in.

. . . .

He came in and told her that you better not see him, and if you—I'm going to kill Waheed and Haider, Haider is her brother. Is Zamen's brother. Will kill you.

Q Do you specifically remember Zamen Al–Kasid testifying under oath that Mr. Ali Al–Timimi told her that he was going to kill Waheed?

A Yes.

(*Id.* at 75–76.) On cross-examination, Detective Kanitra stated that she did not take notes during the preliminary examination, and that she was recalling Zamen's testimony strictly from memory. She also stated that she did not remember which facts were brought out during the direct examination as opposed to those elicited on cross-examination. (*Id.* at 85.)

The final witness to recall Zamen's preliminary examination testimony for the jury was Detective Sergeant Paul Keiper of the Dearborn Police Department. His recollection of her testimony was consistent with that of the other two witnesses. He stated that

A short time later [after her father slapped her], Ali Al–Timimi came into the room. He was again upset with her over not listening to what the family had said and he told her that he was going to kill Waheed and that her brother Haider was going to kill her.

(*Id.* at 92–93.)

The defense elected not to call any witnesses who were in the courtroom during

the preliminary examination to testify as to their recollection of Zamen's testimony.

At the conclusion of the five-day trial, the jury was instructed on the elements of first-degree murder, second-degree murder, involuntary manslaughter, and negligent homicide. (Dkt. 18, TT of 10/10/02 at 194–200.) The jury found Petitioner guilty of second-degree murder, and he was subsequently sentenced to 15 to 25 years in prison.

### C. Post–Conviction Procedural History

On September 9, 2003, Petitioner filed through counsel an appeal brief with the Michigan Court of Appeals, raising the following two claims:

I. WERE THE DEFENDANT'S SIXTH AMENDMENT RIGHTS TO CONFRONT AND CROSS–EXAMINE THE WITNESSES AGAINST HIM VIOLATED BY THE ADMISSION AT TRIAL OF A GROSSLY INCOMPLETE RECONSTRUCTION OF THE PRELIMINARY EXAMINATION TESTIMONY OF PERSONS PRESENT WHEN THE FORMER TESTIMONY WAS ORIGINALLY GIVEN AND WAS SUCH A RECONSTRUCTION INADMISSIBLE IN ANY EVENT WHERE IT FAILED TO INCLUDE ALL OF THE SUBSTANCE OF THAT WITNESS TESTIMONY, INCLUDING THAT GIVEN ON CROSS–EXAMINATION?

II. DID THE TRIAL COURT ERR IN SCORING 15 POINTS UNDER THE SENTENCING GUIDELINES FOR OFFENSE VARIABLE 5, WHICH RE-QUIRES THAT A SERIOUS PSYCHOLOGICAL INJURY REQUIRING PROFESSIONAL TREATMENT OCCURRED TO A MEMBER OF THE VICTIM'S FAMILY?

(Rule 5 Materials, Dkt. 25, Defendant–Appellant's Brief on Appeal at vii.)

The Michigan Court of Appeals affirmed Petitioner's conviction and sentence in a five-page unpublished opinion. (Rule 5 Materials, Dkt. 25, *People v. Al–Timimi*, No. 245211, 2004 WL 1254271 (Mich.Ct. App. June 8, 2004).)

Petitioner appealed to the Michigan Supreme Court. On March 23, 2005, leave to appeal was denied because the court was "not persuaded that the questions presented should be reviewed by this Court." (Rule 5 Materials, Dkt. 26, *People v. Al–Timimi*, No. 126725, 472 Mich. 882, 693 N.W.2d 822 (Mich.2005)).

On October 6, 2005, Petitioner filed through counsel his Petition for Writ of Habeas Corpus, presenting the following claim for relief:

I. PETITIONER WAS DENIED HIS SIXTH AMENDMENT RIGHTS TO CONFRONT AND TO CROSS EXAMINE THE WITNESSES AGAINST HIM WHEN HIS CHIEF ACCUSER WAS NOT PRODUCED FOR TRIAL AND, IN THE ABSENCE OF THE PRELIMINARY EXAMINATION TRANSCRIPT, THE DISTRICT COURT MAGISTRATE AND TWO POLICE OFFICERS TESTIFIED BEFORE THE JURY AS TO WHAT THEY BELIEVED HER TESTIMONY WAS.

(Pet., Dkt. 1 at 3.)

### D. Law and Analysis

#### 1. Standard of Review

Petitioner is entitled to a writ of habeas corpus only if he can show that the state

court's adjudication of his claims on the merits—

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

 A state court decision is "contrary to" Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent" and arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 1519, 146 L.Ed.2d 389 (2000). A state court decision involves an "unreasonable application" of Supreme Court precedent "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular ... case" or if the state court either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context. *Id.* at 1520. The state court decision, however, need not cite Supreme Court precedent, or even reflect awareness of Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam).

### 2. Confrontation Clause Claim

The Confrontation Clause of the Sixth Amendment provides that a criminal defendant "shall enjoy the right ... to be confronted with the witnesses against him." U.S. CONST. amend. VI. Petitioner's sole claim in his habeas petition is that his Sixth Amendment right to confront his accuser was violated by the admission of Zamen Al–Kasid's preliminary examination testimony by means of the recollection of persons who were present at the hearing.

### a. State Court Record

Petitioner clearly presented his federal Confrontation Clause claim to the Michigan Court of Appeals by arguing that the admission of an incomplete account of Zamen's preliminary examination testimony through the testimony of others failed to satisfy the constitutional requirement of a guarantee of trustworthiness as set forth in *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). (Rule 5 Mat., Dkt. 25, Br. on Appeal at 24.) The claim was addressed at length and decided as follows:

> Defendant contends that the trial court erred in admitting the testimony of three witnesses, who testified regarding the statements made by Zamen Al–Kasid at defendant's preliminary examination. At the preliminary examination, Al–Kasid testified that defendant told her he would kill the victim. Defendant does not contest that a complete transcript of the preliminary examination could not be prepared. Moreover, the question of Al–Kasid's unavailability is not at issue in this appeal. Instead, defendant argues that the admission of the three witnesses' testimony violated his constitutional rights under the Confrontation Clause of the Sixth Amendment of the United States Constitution because the testimony constituted an incomplete record of Al–Kasid's statements.
>
> In *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), abrogated in part by *Crawford v. Washington*, [541] U.S. [36], 124 S.Ct. 1354, [158]

L.Ed.2d [177] (2004), the United States Supreme Court addressed the interplay between the admission of hearsay evidence and the Confrontation Clause. The Court recognized that it has tried to accommodate the various competing interests at stake. *Id.* at 64 [124 S.Ct. 1354]. The Court stated:

The Confrontation Clause operates in two separate ways to restrict the range of admissible hearsay. First, in conformance with the Framers' preference for face-to-face accusation, the Sixth Amendment establishes a rule of necessity. In the usual case (including cases where prior cross-examination has occurred), the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant.

The second aspect operates once a witness is shown to be unavailable. Reflecting its underlying purpose to augment accuracy in the factfinding process by ensuring the defendant an effective means to test adverse evidence, the Clause countenances only hearsay marked with such trustworthiness that there is no material departure from the reason of the general rule. The principle recently was formulated in *Mancusi v. Stubbs* [408 U.S. 204, 213, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972) ]:

The focus of the Court's concern has been to insure that there are indicia of reliability which have been widely viewed as determinative of whether a statement may be placed before the jury though there is no confrontation of the declarant, and to afford the trier of fact a satisfactory basis for evaluating the truth of the prior statement. It is clear from these statements, and from numerous prior decisions of this Court, that even though the witness be unavailable his prior testimony must bear some of these indicia of reliability.

The Court has applied this indicia of reliability requirement principally by concluding that certain hearsay exceptions rest upon such solid foundations that admission of virtually any evidence within them comports with the substance of the constitutional protection. This reflects the truism that hearsay rules and the Confrontation Clause are generally designed to protect similar values, and stem from the same roots. It also responds to the need for certainty in the workaday world of conducting criminal trials.

In sum, when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate indicia of reliability. [*Roberts, supra* at 65–66, 100 S.Ct. 2531 (certain citations and internal quotations omitted).]

In *Crawford, supra* at 1374, the Court stated that "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." In other words, there must have been an opportunity for cross-examination. *Id.* Here, it is undisputed that defendant had the opportunity to cross-examine Al–Kasid at the preliminary examination. Therefore, the admission into evidence of Al–Kasid's preliminary examination testimony did not violate defendant's rights under the Confrontation Clause.

(Rule 5 Materials, Dkt. 25, *People v. Al–Timimi*, No. 245211, 2004 WL 1254271, at

1–2 (Mich.Ct.App. June 8, 2004) (unpublished) (citation form altered)).

### b. Discussion

■ Petitioner is only entitled to a writ of habeas corpus if the state court decision was contrary to or involved an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d). "When analyzing whether a state court's decision is 'contrary to' or an 'unreasonable application of' clearly established federal law, this court may only look to Supreme Court precedent as of the time of the state court's decision." *Fowler v. Collins*, 253 F.3d 244, 249 (6th Cir.2001).

When Petitioner's appeal brief was filed on September 9, 2003, Confrontation Clause challenges were analyzed according to the rule of *Ohio v. Roberts, supra*, which provided that hearsay statements by unavailable declarants were only admissible if they bore "adequate indicia of reliability" by either "fall[ing] within a firmly rooted hearsay exception" or possessing "particularized guarantees of trustworthiness." *Roberts*, 448 U.S. at 66, 100 S.Ct. 2531. One of Petitioner's arguments is that Judge Sobotka, Detective Kanitra, and Detective Keiper were all biased against Petitioner[1] and therefore their hearsay testimony recounting Zamen's preliminary examination testimony was untrustworthy, unreliable, and in violation of the Confrontation Clause. (Dkt. 1, Br. in Supp. of Pet. at 13–14.)

On March 8, 2004, however, three months before the Michigan Court of Appeals' decision in Petitioner's case, the U.S. Supreme Court overruled the adequate-indicia-of-reliability test from *Rob-*

---

erts and held that an out-of-court statement by a witness that is "testimonial" in nature is barred unless the witness is unavailable to testify at trial and the defendant had a prior opportunity to cross-examine the witness. *Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) ("Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination.").

In this case, Petitioner does not dispute that Zamen's statements at the preliminary examination were "testimonial" in nature, nor could he do so. *See Crawford, supra*, at 68, 124 S.Ct. 1354 (leaving for another day any effort to spell out a comprehensive definition of "testimonial," but stating that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing ...."). Further, Petitioner does not dispute that Zamen Al–Kasid was "unavailable" to testify at the trial. Therefore, as Respondent contends, there is no question that, had a complete transcript of Zamen's preliminary hearing testimony been available, it would have been admissible at trial. It thus follows that what Petitioner really takes issue with is the *manner* in which Zamen's prior testimony was presented to the jury—through the testimonial account of three eyewitnesses.

The only Supreme Court case Petitioner cites in support of his argument that this manner of presentation was unconstitutional is *California v. Green*, 399 U.S. 149, 165, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). Petitioner asserts that *Green* stands for

---

**1.** Petitioner argues that Judge Sobotka was biased because her duty at the preliminary examination was not to determine guilt or innocence, but to determine whether the prosecution had presented evidence on all elements of a crime. (*Id.* at 13.) Therefore, the argument apparently goes, she was paying

more attention during the prosecutor's direct examination than the defense attorney's cross-exam. With regard to the police officers, Petitioner alleges that their recollection was biased because police officers are engaged in the "often competitive enterprise of law enforcement." (*Id.* at 14.)

the proposition that "admission of former testimony in a criminal case is dependent on four conditions being met. These are: 1) the declarant was under oath at the preliminary hearing; 2) the accused was represented at the preliminary hearing by the same counsel who later represented him at the trial; 3) the accused had every opportunity at the preliminary hearing to cross examine the declarant as to his statement, and 4) the proceedings at the preliminary hearing were conducted before a judicial tribunal, *equipped to provide a judicial record of the hearing.*" (Dkt. 1, Br. in Supp. of Pet. at 14–15 (emphasis added).)

Respondent counters that, first, *Green* set forth no such four-factor test, and second, even if it did, it is no longer good law in light of *Crawford*'s bright-line two-factor test: unavailability and a prior opportunity for cross-examination. (Dkt. 7, Ans. in Opp. at 7.) I suggest that Respondent is correct on both counts. In *Green*, the Court was not faced with the case of an unavailable witness. Instead, the California Supreme Court had held that the preliminary examination testimony of a witness who was available and testified at trial, but who claimed at trial that he could no longer remember the events in question, could not be used as substantive evidence of guilt pursuant to the Confrontation Clause. The U.S. Supreme Court reversed, holding that

> the Confrontation Clause does not require excluding from evidence the prior statements of a witness who concedes making the statements, and who may be asked to defend or otherwise explain the inconsistency between his prior and his present version of the events in question, thus opening himself to full cross-examination at trial as to both stories.

*Green*, 399 U.S. at 164, 90 S.Ct. 1930. This case is clearly distinguishable since here the declarant was unavailable at trial.

Furthermore, the four-factor "test" that Petitioner claims *Green* set forth was stated in a paragraph of *dicta* where the Court was bolstering its holding by comparing the situation before it to a situation where a declarant is actually unavailable at trial:

> We also think that Porter's preliminary hearing testimony was admissible as far as the Constitution is concerned wholly apart from the question of whether respondent had an effective opportunity for confrontation at the subsequent trial. For Porter's statement at the preliminary hearing had already been given under circumstances closely approximating those that surround the typical trial. Porter was under oath; respondent was represented by counsel—the same counsel in fact who later represented him at the trial; respondent had every opportunity to cross-examine Porter as to his statement; and the proceedings were conducted before a judicial tribunal, equipped to provide a judicial record of the hearings. Under these circumstances, Porter's statement would, we think, have been admissible at trial even in Porter's absence if Porter had been actually unavailable, despite good-faith efforts of the State to produce him. That being the case, we do not think a different result should follow where the witness is actually produced.

*Green*, 399 U.S. at 165, 90 S.Ct. 1930. Read in context, this paragraph certainly did not set forth a four-factor test for the admission of prior testimony when a declarant is unavailable, but rather was merely part of the Court's attempt to show by analogy that its reasoning in the case before it was sound. Therefore, I suggest that *California v. Green* cannot be considered "clearly-established Federal law, as determined by the Supreme Court" for purposes of Petitioner's case. "Under AEDPA, if there is no 'clearly established Federal law, as determined by the Su-

preme Court' that supports a habeas petitioner's legal argument, the argument must fail." *Miskel v. Karnes,* 397 F.3d 446, 453 (6th Cir.2005) (citing 28 U.S.C. § 2254(d)(1); *Taylor,* 529 U.S. at 412, 120 S.Ct. 1495).

Petitioner's final argument is that admission of Zamen's preliminary examination testimony in the manner utilized was improper because it was an incomplete record of her testimony. Petitioner, however, has not cited any U.S. Supreme Court case in support of this proposition. Further, the Michigan Court of Appeals rejected this challenge both factually as well as legally pursuant to state case law:

Defendant essentially takes issue with the manner in which the prosecution presented Al–Kasid's testimony to the jury. In cases such as *Roberts, supra,* and *People v. Meredith,* 459 Mich. 62, 586 N.W.2d 538 (1998), the prosecution used transcripts of the preliminary examination testimony in lieu of the declarant's statements. Here, however, a complete transcript could not be used, because the transcript machinery malfunctioned, and the court reporter died before reconstructing the transcripts from her notes. Therefore, the prosecution was forced to admit into evidence the testimony of those who observed Al–Kasid's preliminary examination testimony; the witnesses consisted of the examining magistrate (who nevertheless was not identified as such) and others. Defendant argues that the witnesses should not have been able to testify because their memories were not complete. Specifically, defendant contends that the witnesses could not testify regarding the substance of Al–Kasid's testimony during cross-examination. Defendant argues that a witness who testifies regarding his or her recollection of earlier judicial testimony must be able to offer a complete recollection of the testimony offered on both direct and cross-examination.

Defendant relies on *People v. Sligh,* 48 Mich. 54, 11 N.W. 782 (1882), as binding authority in this jurisdiction. In *Sligh,* the Supreme Court ruled that the trial court should not have allowed a trial witness to detail the testimony given at an earlier trial by another witness who had subsequently died. *Id.* at 58 [11 N.W. 782]. The Court recognized the competing interests associated with "allow[ing] depositions of deceased witnesses," *id.* at 57 [11 N.W. 782], and stated that "it is very clear that there must be the utmost precaution taken to place it before the jury as nearly as possible as the witness, if living, would have done." *Id.* at 58 [11 N.W. 782].

Any rule gleaned from *Sligh* appears to be countered by the more recent authority cited by plaintiff. Indeed, in *Gloeser v. Moore,* 284 Mich. 106, 120, 278 N.W. 781 (1938), our Supreme Court appears to have relaxed any rule that a witness be able to testify with a particular specificity.

. . . .

[T]he *Gloeser* Court implicitly ruled that [the witness] was competent simply to testify with regard to what he observed.

This reasoning is echoed in [Michigan Rule of Evidence] MRE 602, which provides, in part, that:

[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness' own testimony.

Therefore, just as with *Gloeser,* it is sufficient to allow a witness to testify as long as the witness has personal knowledge of the other witness' testimony. Any failure of a witness to recall the

complete detail of another witness' testimony at an earlier proceeding would be relevant to the issue of credibility. Such a credibility issue is for the jury, and not for an appellate court. *See, generally, People v. Lemmon,* 456 Mich. 625, 637, 476 [576] N.W.2d 129 (1998).

Moreover, even assuming that a trial court, before admitting the testimony of a witness who is recalling another's testimony, is required to ensure that the witness be able to recall both the direct examination and the cross-examination from the earlier testimony, defendant's argument fails. Indeed, defendant fails to demonstrate that the witnesses at issue lacked knowledge about Al–Kasid's testimony on cross-examination at the preliminary examination. Our review of the witnesses' testimony reveals that these witnesses' recollections were not limited to only the direct examination portion of Al–Kasid's testimony. Moreover, defendant had the opportunity to interview and present any other witnesses that may have been present during Al–Kasid's cross-examination. We reject defendant's argument and conclude that the court properly admitted the testimony of the three witnesses in question.

(Rule 5 Materials, Dkt. 25, *People v. Al–Timimi,* No. 245211, 2004 WL 1254271, at 2–3 (Mich.Ct.App. June 8, 2004) (unpublished)). The state court's factual conclusion that the witnesses' recollections were not limited to merely the direct examination is entitled to the presumption of correctness on habeas corpus review. 28 U.S.C. § 2254(e)(2). In addition, it simply "is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). "A federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* There-fore, to the extent Petitioner claims that the state court decision was contrary to state precedent requiring a "complete" record, it is not cognizable on federal habeas review.

In conclusion, since Petitioner has not demonstrated that the Michigan Court of Appeals "arrived at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "decided a case differently than [the Supreme] Court has on a set of materially indistinguishable facts," *Williams,* 529 U.S. at 412–13, 120 S.Ct. 1495, I suggest that the petition for writ of habeas corpus be denied.

## III. *REVIEW*

The parties to this action may object to and seek review of this Report and Recommendation within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.,* 932 F.2d 505 (6th Cir.1991); *United States v. Walters,* 638 F.2d 947 (6th Cir.1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.,* 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.